We're in session for our second case of the day, 410-0936, McFatridge v. Lisa Madigan as Attorney General. You may proceed. Thank you, Your Honors. It's a pleasure to be here today. My name, for the record, is Terry Echol. I represent Mr. McFatridge along with Mr. Robb. Your Honor, with your permission, we have advised the clerk that Mr. Robb and I would like to split up our argument. I would take 12 minutes, Mr. Robb would take 8. I will deal with the application of the State Indemnification Act. Mr. Robb will deal with the affirmative defenses raised by the Attorney General. I think it is a benefit to the Court and a benefit to our audience as well to consider some of the underlying facts relative to the issue before the Court today. Picture yourself, a young lawyer, elected the State's Attorney of a small county in central Illinois, in this case, Edgar County. You are entrusted with the prosecution of two men charged with murder, double homicide. Both of those individuals are convicted. You continue through your tour of being the elected State's Attorney. Ten years later, you go into private practice. In almost 20 years after the initial prosecution, you are sued in federal court under Section 1983 of the Federal Civil Rights Act. You go to the county. You say, county, defend me. They say, no, Mr. McFatridge, you are a State employee. We are not defending you. And they're right. There's case law that says that. You next go to insurance carriers that existed back 20-some years ago. And they both say, uh-uh, we're not covering you. But we will begin to defend you under a reservation of right. I need to clarify something to this Court. At the time the briefs were submitted in this case, Mr. McFatridge had not received any compensation for representation for almost two years. That continues to be true. Since January of 2009, nobody has paid his attorney's fees in connection with the underlying civil rights litigation. That continues to be true today. However, there is a decision by Judge Baker in the Central District indicating that one of the insurance companies does have an obligation to pay and to indemnify. That insurance company has that matter up on appeal today. To date, they have not met that obligation. So going back for almost two years, Mr. McFatridge has had no defense paid for by anyone. After the insurance companies go through their song and dance, McFatridge tenders the defense to the Attorney General under the State Indemnification Statute. And the Attorney General says, no, we are not defending you because under some theory they have analyzed the case and decided that you engaged in willful misconduct and claimed that that's an escape from the State paying for your defense. So what is McFatridge left with at that point? He's left with either not defending himself and allowing a judgment perhaps to be entered against him, which as we'll see later in my argument would have to be paid by the State of Illinois, or defending himself to the tune of somewhere in excess of a half a million dollars on a complicated civil rights case. Your Honors, that is not an unusual sum of money. Or what happened in this case, he found some dumb lawyer like me to continue to represent him without being paid for two years. That's where we are today. This case has tremendous importance, not only to Mike McFatridge, but to state's attorneys throughout this state. Think about that. You are an elected state's attorney, you do your job, and you are then sued in federal court and everybody says you're on your own, you defend yourself. Well, every single 1983 action that's ever filed has to have an allegation of intentional or willful or deliberate indifference to a constitutional right. So under the theory being advocated by the Attorney General here, under no circumstances would they ever defend a state's attorney in a 1983 action. By the way, let me ask this question because it's one I wondered about. You're saying this is an important case and will have serious press night effect. Given the tens of thousands of people who are not happy sitting in the Illinois Department of Corrections, and as we know from first-hand experience, our willing litigants, as a matter of fact, recently characterized as litigants engaging litigation for support. What about any precedent concerning this matter? Have there been no prior lawsuits brought against state's attorneys where this has been an issue about their representation? It just seems to me hard to believe. It is hard to believe, Judge. And first of all, I found the position the AG took in connection with this case to be incomprehensible to me. And since this case has occurred, I know of two other counties who are currently actively litigating, not litigating, they are having discussions with the AG over whether there's going to be coverage or not. So I don't know if the AG has ever taken this position before. I don't know why the position is being taken in this case. I do know that in connection with this case, the State's Attorney's Association filed an amicus brief in the trial court here in support of our position because of the overall effect it could have on state's attorneys statewide. But Justice Steigman, in answer to your question, I don't know of any litigation that has ever occurred over this. So we're the first, and what we say, at least as far as courts of review go, that'll be the first time? Yes, Your Honor. Here's another question. You said you were going to discuss the statute. And looking at the statute, one of the arguments the Attorney General makes is that the second paragraph of Section B speaks of someone is an elected state's attorney, as opposed to an elected state official, rather, as opposed to, in your client's case, someone who was an elected state official. My first question is, are you claiming that that's the second paragraph that is the basis of the Attorney General's duty to provide the cost of your client's representation? Yes, Your Honor. The basis or the genesis of the obligation is to be the second paragraph. And I'll address the argument of the what does is mean. That entire Section 350 is all in the present tense. Well, I've read that in your brief. But the problem is that Section 1B, as the state's attorney, or the AG, points out, says the term, and you otherwise are correct, but the first sentence of 1B says the term employee means any present or former elected or appointed official. And that, I believe, was in the statute. I went back and checked when it was first enacted in 1977, as was the language in Section 2B, where it's just in the present tense. Now, Lord knows, dealing with statutory draftsmanship, you don't want to put too much on it. But nonetheless, they make an argument that, hey, the legislature is capable of referring to former elected state officials when they wish. What about the... that McFatridge qualifies under 2B as a state employee because he is a former employee. In other words, part of their argument is that former state employee equals state employee for purposes of the statute. And then they argue under 2B, second paragraph, that former elected state official doesn't equal present elected state official. That argument doesn't flow. Why not? Because it's inconsistent. If you are... if a former state employee is covered under 350-1, it's the same as a state employee. Why doesn't that same analysis hold true for the second paragraph of Section 2B? And the entire statute is couched in the terms of present... in the present tense. And the final part of my argument on that, it makes no sense. We're here trying to glean some type of intent out of this statute. How about this for a hypothetical? I'm an elected state's attorney. I'm in office. The day before I leave, I get sued. I get coverage. Or I leave and a day later, I get sued. Now I don't get coverage because I'm out of the office. The clear intent is, were you the elected official at the time you committed the act, which is the subject matter of the cause of action? That's the only way that statute makes any sense at all. Or if you're a state's attorney and the state is covering you for a couple of years and then you leave, does the coverage then... Well, going back to my question, though, is my understanding correct that your position is the language appearing in Section 2B, first paragraph, about the matter being alleged based on intentional willful or wanton misconduct doesn't even matter because your client is an elected state official? Exactly. All that language about the attorney general having the ability to decline a defense if they determine or she determines it's willful or intentional has no application if you were an elected official. You can't graph that language out of the first paragraph of 2B and put it into the second paragraph. That's Tully versus Edgar, which is cited. Exactly the same situation. And the reason makes sense. If I'm an elected official, I'm answerable to the voters. A straight state employee is not. And imagine the political club that exists if the attorney general had the ability to deny another elected officeholder a defense, potentially for political reasons. That statute evidences the fact that an elected official is going to be treated differently than any other type of state employee. So you think it's and I noticed again 1977 was first enacted. This distinction was drawn. You think the distinction between elected state official and state employees was intended? Yes, Your Honor. Why did they put in a provision about judges later on? Paragraph C talks about the representation and identification of a judge. I'm theorizing that this is a post-Greylord event where we had Judge Tom Maloney, among other crooks on the bench, convicted and sent off to prison. And they added a sentence when a judge has been convicted of a crime as a result of his or her intentional misconduct. And you get nothing, no how, neither from nobody, period. I really don't glean any benefit or any guidance in trying to interpret that statute by what the legislature did in connection with judges. Well, the reason I mention it is you saw the AG says, hey, the legislature is prepared to throw in something like this. Look what they did for judges. Why didn't they throw it in in the second paragraph of 2B? If they wanted to give the AG the ability to deny an elected official a defense based upon the same standard as other state officials, why didn't they put it in? And Tully says specifically that. You can't graft language from one paragraph into another. There was a reason for that. We have to anticipate that there was a reason for that. Is Tully the only case that's remotely on point? Yes, Your Honor. It's the closest case I think that we have. And I think it's, you know, can you try to distinguish it based upon some type of an artificial argument? Possibly the AG tries to do it. But when you have language such as we find it notable that the cooperate consent and settlement language in Section 2A of the Indemnification Act does not appear in 2B, this omission is significant. And then this paragraph is what I think really seals the deal. When an elected official is sued because of some alleged wrongdoing while acting as an elected official, the Attorney General only has the discretion to refuse payment of defense costs if she finds the elected official's choice of counsel unsatisfactory or the defense charges are unreasonable. Have we crossed that threshold in this case? Not at all. There's never been any... Well, I phrased that badly. Has the Attorney General here ever challenged either counsel or the reasonableness of fees? No, Your Honor. They never questioned my representation of McFatridge, and we never got to the point of fees because they never agreed to pay anything. So they weren't reviewing my bills or negotiating a rate or anything like that. We never got to that point. It was just a flat-out refusal to pay a nickel. And based upon the intentional, willful, or wanton misconduct claim of the complaint? Right. And I don't know... Again, we could talk about that in connection with elected officials, which we are here, or we could talk about it in connection with state employees in general. I don't know what the standard is. Well, let me ask you this. I want to ask them that. I have very little experience with 1983 claims, but it seems to me, and I want to make sure I understood your earlier remarks, that in 1983 claims against state employees and state officials, this is a standard claim? It's a necessary claim. If I commit a just merely negligent act that results in a constitutional violation... Under color of state law, that's not good enough? It is not. It must be an intentional or deliberate indifference to a known constitutional right to substantiate a 1983 action. So deliberate indifference, as we all know, equals willful and wanton. It's the same standard. So in every 1983 action, there is going to be an allegation in the complaint of deliberate indifference, which is the equivalent of willful and wanton. The other thing in construing the statute, given that we're talking about federal civil rights claims generally, we don't have much in the way of suits in state court against state actors. Assuming the legislature is experienced with the milieu of federal civil rights litigation, how long does it typically take? From start to finish? From complaint until resolution? Whatever that would be. I had one in the DuPage 7 case that went on for nine years. This case has been going on for, I believe, six years. And we are currently in the Court of Appeals on a denial of a motion for summary judgment on all defendants. And I firmly suspect it will get kicked back for additional findings of fact by the trial judge. It will then go back to the Court of Appeals. And then if it's denied, it will go back for trial. I would say we are at least two years from any potential... Who are the typical defendants? Police officers in 1983 actions? Police officers, defendants customarily try to hook in prosecutors to get a deeper pocket, being either the state of Illinois or possibly an insurance company representing the county. If it's just cops, how long would it take then typically? I don't know if I could put an accurate estimate. At least two years minimum. Any decent sized civil rights case is going to take two years. Minimum. This deals with the question I asked you earlier about the present tense is an elected state's attorney. Because if someone leaves office, the question is, does representation earlier continue? It has to. Do you think Lisa Madigan, when she leaves office, and she probably gets sued 20 times a year in various kinds of cases, do you think really that she's going to take the position, now that I'm no longer in office, I'm not entitled to be represented by the state of Illinois at no charge, that I'm now going to fund all of my defenses? That's the position they're taking here. It doesn't make any sense to me, and it's not right. I've probably read this statute a minimum of 50 times. I want to ask you this question. To me, when you... I don't know if that's me or you. I think it's me. I'm kind of clumsy with these things. When you look at 2A, it starts out and says... I'll just talk through this. Basically, if you're a state employee, and that includes everybody under the definition of state employee, you're entitled to have the attorney general come in and represent you. Yes, Your Honor, provided that the actual omission occurs within the scope of the employee's state employment. Right. Which just, again, just makes sense. If you have a car accident when you're out on a weekend, obviously there's no right to representation. And then when you move to paragraph B, it says, however, basically, if the AG's office determines that there's a conflict of interest, or the employee engaged in wrongful or rotten misconduct, then the AG's office doesn't have to represent you. And if there's a conflict of interest, you're entitled to hire your own attorney. But if it's wrongful and rotten, you're entitled to hire your own attorney and get reimbursed as your expenses occur if there's a conflict of interest. But if it's wrongful and rotten misconduct, you have to hire your own attorney, and you're not entitled to get reimbursed as your expenses occur unless the jury finds you not guilty of wrongful and rotten misconduct. Yes. Then you're entitled to be indemnified. In other words, you front all of the money for your defense, and then at the end, if the jury both decides that it was within the scope of your employment and that it was not willful and rotten, only then could you recoup all of your out-of-pocket expense, which, again, depending on the severity of the litigation, could be in the hundreds of thousands of dollars. Actually, Mr. Eckel, I'm not sure. I don't know if it's important, but I think you may be conceding too much because I read the same sentence, and that's what the AG says it says, and that's what you might think they intended to say. But the sentence ends with the phrase, as they are incurred. If the litigation expense and attorney's fees, to the extent proved by the attorney general as reasonable, are to be paid as they are incurred. We're not talking about that paragraph. That's not the one you're talking about? I was getting to that. My next question was, though, in that next paragraph of 2B, where it says in the event that the defendant is an elected state official, to me what made sense to me in looking at the statute, and I know we can't do it, but I'm just going to ask you this question. If that paragraph was in 2A, after the general language about any state employee's entitled to a defense by the attorney general's office, and then that paragraph was in 2A, and it said, however, if you're an elected official, you get to hire your own attorney, and then we looked at 2B, I mean, we'd be in a different position. It would be a – potentially, Your Honor, it would be a tougher issue. And, again, I'll be the first to say, and I'm sure the three of you sitting here already recognize, this is an inartfully drafted statute, and we could do a heck of a lot better. And one of the things that should occur is this thing should be straightened out to some degree because it is somewhat confusing. In a moment, I'm going to get to another part that's even more confusing, which really supports my argument. But, Your Honor, I think if it was in the same paragraph, I think the AG's office, their argument might be a little stronger. But the fact that it's in a completely separate paragraph, which leads in with, in the event the defendant in the proceedings is an elected official, I think clearly shows an intent that the elected officials be treated differently than other state employees. Well, they would be treated differently, even under 2A, because they'd be able to hire their own attorney and not have to take the AG's representation. Right, I mean, again, yes. So they would be treated differently, even if that section was up there. To that extent. Your argument is, under 2B, they're treated differently because there's no restriction about willful or wanton misconduct. Exactly. What I'm saying is, regardless of, and that's why I don't need to get into a discussion as to the standard of proof or the standard of analysis or where the AG comes to his or her conclusions, because this exclusion of a defense because of willful and wanton allegations is not relevant if you are an elected official. If you are an elected official, this is our position, you are entitled to a defense regardless of what the AG thinks about the allegations against you. Now let me get to another point. This ties into something Judge Stegman was just raising. If you get to that point, you're going to be encroaching on your counsel's time. I am. Can I take two more minutes? This is real fast. Because if I encroach on Mr. Rob, I might get my hand slapped or something. All right, here's the part that I think is really interesting that you have to consider. And this is under the common sense analysis. When we go to indemnification, okay, we go to indemnification, and the statute there says that the state has to indemnify unless the jury finds both that it was not within the scope and it was willful and wanton. So in the case of McFatridge, clearly he was in the scope of his employment, and under Section 2D, unless the jury somehow found that prosecuting criminals was not within the scope of his employment, they've got to pay. What kind of a thought process or legal analysis is going on if you don't want an individual to have a defense for which you have an indemnification responsibility? It makes no sense whatsoever. And it clearly, I think, ties back into what the legislature was trying to do here, which was the individual elected official must have a defense, and then if he loses, the state's got to pay. Thank you very much. Now we have some other things that we're about to fix. I'm told by the timekeeper that you encroach quite a bit, but we're going to let you proceed anyway. Not the two minutes, but before that. Okay, thank you. We always have a red light and an amber light, and it's not quite as effective to use the placards holding them up. Thank you. Your Honor, I'm here, Mike Robb, I'm here to address the defenses raised by the Attorney General. They lack all merit, and I think I can address them relatively briefly. First of all, the statute of limitations defense doesn't control the outcome of this case. The Attorney General claims that since McPhattridge did not file this mandamus case for five years after the denial of a defense, his statute of limitations has expired. However, there are two cases that we're seeking a defense on, the Steidle and the Whitlock case. The Whitlock case was filed much later than the Steidle case. The Attorney General does not raise that defense, and the cases have been consolidated both for trial and discovery in the trial court. You can't defend one case without the other. So irrespective of whether the statute of limitations were violated to the Steidle case, it's irrelevant because the cases have been consolidated. I guess it could only be relevant if Whitlock settled and Steidle didn't, leaving only Steidle out there, but that's not the case. Both cases are still consolidated. So that's really kind of a red herring and does not control the outcome of this case. In order to prove the defense of laches, the Attorney General must show both an unwarranted delay in prosecuting the suit and prejudice. Here, once the Attorney General denied coverage or a defense, McPhattridge got a couple of insurance carriers to defend him, thereby saving the state about half a million dollars in defense costs. Only after the insurance companies refused to pay did he bring this suit. He brought that suit within two months of the insurance company's decision not to pay. There's been no prejudice to the Attorney General. She is currently defending, I think, five or six state police officers in this same lawsuit. She's aware of the suit. She's aware of what's going on. She's not claimed that she would have taken any different position had this mandamus action been filed sooner. Lastly, on sovereign immunity, the Illinois Supreme Court in the Senn Park Nursing Center case discussed sovereign immunity and mandamus. They held that when you're trying to compel a state officer to comply with a duty imposed by law, that does not implicate sovereign immunity, even if the court's ruling might result in expenditure of state funds. That case dealt with the calculation of inflation benefits of Medicare or Medicaid payments. We are not, in this case, claiming back payments from the state. This is not a debt collection case. This is a forward-looking case saying that the Attorney General, in the future, from the date of the filing of the mandamus case, has a duty to defend Mr. McFatrick and the underlying cases. The Jones v. Department of Public Aid case acknowledged that distinction. They acknowledged the distinction between an action to collect back payments, which is a debt collection case, belonging in the court of claims, and a case asking the court to order a state official to perform their legal duty in the future, which is what we are claiming here. So I think all the affirmative defenses raised by the Attorney General lack all merit. Thank you. Good afternoon, and may it please the Court. I'm Michael Skodro from the Office of the Illinois Attorney General, here on behalf of the defendant.  First of all, the Attorney General's position is not that you take the plaintiff's word for it when it comes to whether or not there are allegations of willful and wanted misconduct. That is a mischaracterization. Indeed, this very case proves that point. As was just represented, and it's true, the Attorney General's office is representing the other state defendants in this case. In a much-publicized effort, the Attorney General delved into the merits of this case and concluded, made the determination, to use the verb that's used in 2B, made the determination that in this case there was a credible claim of willful, wanted misconduct on the part of Mr. McFatridge. That's the reason. Can I ask you a question about that? Yes. Because it looked to me, as you say, that the AG has to make an actual determination that there is some evidence of willful and wanted misconduct. But when I looked at the letter that was sent from the Attorney General's office, it seemed to me what she was relying on was the fact that the plaintiff filed a claim with allegations of willful and wanted misconduct. Thank you, Your Honor. To be sure, in the first letter, the one from Barry Gross that's in the appendix, does refer to the fact that there were allegations made. But that was July 6th of 2005, and at that point the office had already delved deeply into the case. Starting in 2003, when the decision was made not to seek an appeal from Mr. Steudle's grant of habeas relief in the district court, I would also refer, Your Honor, to the next page in the appendix, A-100. It's the second request, second or third request, by Mr. McFatridge for coverage. That one makes clear that the Attorney General is relying beyond just the allegation and the complaint. Indeed, the letter cites the fact, quotes from the Fourth Circuit's, the Fourth District's decision, rather, of finding a Brady violation in the case. And, Your Honor, if I may, I do want to make clear one other thing, the extraordinary nature of the statutory interpretation that's being offered here. It is not the Attorney General's position that we're grafting anything onto anything else. On the contrary, their position is, in sum, that seven words, a seven-word phrase that appears at the beginning of 2B ought not to apply to elected officials, that somehow the second paragraph of 2B excises the words, or was intentional, willful, or wanton misconduct. And let me please explain, because I think there are aspects of their brief that suggest you can simply skip the first paragraph of 2B in cases of elected officials, but their own position is inconsistent with that, as is the plain language of the statute. They concede, citing 2A only, that elected officials, excuse me, have to have been acting within the scope of their employment to be covered. Well, it's the first line of 2B that explains who makes that determination and how it's made. They've conceded that they are out of bounds if they're not acting within the scope of employment, a determination that is not always obvious in every case, as one can readily imagine. That determination is committed to the Attorney General. And by conceding appropriately that elected officials are subject to that limitation, they concede the beginning of 2B applies to them. Where did they concede that? Your Honor, both on page 11 of their brief and also in their filing below, they make the point that the Attorney General recommends, I'm sorry, page 16 of their brief and C132 in the record, Your Honor, which is also in the appendix, which is their lower court filing. They make the point in both instances, and again, it was represented from the podium today, that even as to elected officials, they are not covered in the event that they act outside the scope of their employment. And they cite 2A for that. What they're missing, of course, is that 2B provides the explanation of how that determination is made. It's made by the Attorney General, and it's explained in the very first part of 2B. They also overlook the fact that the word employee is used not only in that phrase but throughout the first paragraph in 2B. An employee is defined to include elected officials in 1B. So what they'd ask this court to do is interpret to the first paragraph only of 2B as if the word employee were rewritten to mean non-elected or unelected employee. And finally, if we look at the second sentence of 2B, it's one that was alluded to earlier in Your Honor's questions, this is the sentence that deals with conflicts of interest. The second sentence provides, and it should be fairly obvious why it does so, that in the case of an Attorney General who has an actual or potential conflict of interest, so imagine that the Attorney General is actually adverse to the state employee who's seeking defense costs. Under those circumstances, not surprisingly to Your Honor's earlier question, the statute provides that you get your own counsel paid for by the state, and you don't have to run that counsel by the Attorney General. She exercises zero veto power over that lawyer, which makes perfect sense if we imagine the circumstance in which she's actually conflicted. If you skip all of the first paragraph of 2B for elected officials and rely entirely on the second paragraph, they have to run their choice of lawyer by the Attorney General, even in cases where there's an actual conflict. So what are we left with? Well, most of the first sentence has to apply to them by their own reckoning. All of the second sentence has to apply to them. And so what they're excising is the phrase, or was intentional, willful, or wanted misconduct. That's the phrase they believe the second paragraph of 2B somehow, without saying so. Is it your position that all Brady violations are intentional, willful misconduct so as to cause a prosecutor to be without representation under this statute? Well, putting aside absolute immunity, Your Honor, there are instances certainly in which, Brady among them, in which a claim of intentional misconduct will be in play. But that is true for all sorts of civil rights claims as to all employees. I'm talking about prosecutors in particular. That's where I want to keep focusing, counsel. But it would also, Your Honor. If there's a Brady violation alleged by a guy sitting in Menard and he brings a suit in federal court, so the response is, I'm sorry. We ain't covering that, counsel. Forget it. Two responses, Your Honor. First of all, I don't know that Brady requires. I have to think of my Brady elements. There's materiality and the fact that it's exculpatory. If intent is required. Well, the state, the inmate says, you intentionally withheld this, Mr. Prosecutor. Right. And I'm dragging you over to federal district court here in Danville. What about that? Two responses, again. One is, that applies to all prosecutors, and there's no question here that this statute applies to all prosecutors. And prosecutors are routinely defended by the state, even notwithstanding those allegations. I don't understand this as being responsive to the question. Well, the second part of the question is, yes, that may be an allegation. But as I said at the outset, the attorney general has to make a determination. And the routine determination would be to defend somebody. But in a case where that determination comes out differently, she won't defend them. Now, the statute has a backup for this, by the way. The statute backup is later in the first paragraph of 2B. And that's the provision that if the attorney general's initial determination is incorrect, and you are vindicated at the end of the day, you not only receive indemnification for the full judgment, but you're also entitled to payment of all defense costs. And this, by the way, is one of the reasons this points up the misreading of 2D. What about the phrase I called to the attention earlier, that your brief leads out, as you quote Section 2B? Your brief talks about the act of remission which gives rise to claim was not within the scope of the employee's state employment, was intentional, willful or wanton misconduct. Then the next sentence talks about how upon receipt of such declination or upon withdrawal by the attorney general on the basis of the actual potential conflict of interest, the state employee may employ his own attorney to appear and defend in which event the state shall pay the employee's court costs, litigation expense, and attorney's fees to the extent approved by the AG as reasonable, as they are incurred. Exactly, Your Honor. You left that phrase out of your brief. Well, Your Honor, that phrase is perfectly consistent with our position. How is as they are incurred consistent with if you win at the end and the jury decides that there was nothing intentional, then we'll reimburse you? Sure. Your Honor, how do you pay it as it's going on and still do that? Your Honor, the phrase you've read is at the end of the sentence that covers instances in which the attorney general has a conflict. It's actually the next sentence that says, in the event the attorney general declines to appear or withdraws. It says, counsel, upon receipt of such declination or upon withdrawal by the attorney general. I'm sorry, Your Honor. The phrase on the basis of the withdrawal situation, right? It's not. The earlier sentence makes clear that in the event of a conflict, she can either decline or withdraw. This is referring, if you look a little further, it refers to what modifies that phrase is on the basis of a potential conflict of interest. The very next sentence begins with, in the event that the AG declines to appear or withdraws, and then under the two disqualifying factors, namely that it was outside the scope of your employment or because there was intentional misconduct, and that proceeds then to explain. That just explains the withdraw by the attorney general. The first part of the clause, before the word or, doesn't talk about anything about conflict. It just says, upon receipt of such declination, which could be based upon the willful misconduct. I understand. And then it says it's supposed to be paid as they are incurred. How does that figure with the attorney general's theory that, hey, you win the case, we reimburse you? The very next sentence is what says, if you win the case, I'll read, in such event, the state shall also pay the employee's court costs, litigations, and attorney's fees, to the extent approved. Aren't you reading out the words, as they are incurred from the statute, by this interpretation? Not at all, Your Honor. Please let me be clear. Okay. The sentence to which you're referring, in artful as it is, the phrase, on the basis of an actual or potential conflict, modifies everything that comes before it. It's the only way to make sense of the statute. It follows upon the announcement that, sometimes the AG is going to have a conflict. The very next sentence deals with the remaining two options, under the first paragraph of 2B. And to a plaintiff's point about 2D, here's where he's confused on what 2D means. It's 2B that includes language for indemnification in a case like this, where the attorney general declines representation at the outset. That provision goes on to say, with that final sentence in the first paragraph, in such event, the state shall pay the attorney's fees, court costs, and all the defense costs. It makes good sense. If the attorney general was wrong, made an initial determination, now you've been vindicated. Everything comes back. The reason we know 2D, to which counsel referred, doesn't apply in cases where the attorney general has initially declined representation, there are two ways to know that. One is, it doesn't include the intro phrase, like the one in 2B does, in the event the AG declines to appear or withdraw. The other reason is, it doesn't include a provision in 2D for reimbursement of defense costs. The reason 2D doesn't include it is because 2D is the typical, the run-of-the-mill case, in which the attorney general has either paid for your representation or has represented you personally, and therefore there's no need to include any reference in 2D to the back payment of your defense costs, the way that it appears in the first paragraph of 2B. One of the things that concerns me as a matter of public policy is that if we accept the representation, and it comports with my understanding of federal litigation in 1983 cases, if you've got five to seven to nine years of litigation, what the hell good does it do to get indemnified if you prevail that much later? You will have lost your house, your IRA if you're lucky enough not to have one, and you may very well lose your family. And some people might say, well, that's just if they were willful in wanting, but if they were not, in which instance, and they are exonerated by the court system that exonerated Mr. Steudle eventually, then how does that comport with public policy or do what maybe the state ought to do for its elected officials? I don't understand how that works in the real world. I understand how it would work in a lawsuit that's going to be over in a year or two. I haven't seen one of those in a long time, but how does it? Is that really what the legislature wanted? It is, Your Honor, and let me provide a couple of answers to your question. First is, we all agree that is true for the run of state employees, whether it's good policy or not. State employees are sued, and the rule you just announced is the rule that applies to everyone. The only question here is, is there something special about, in their view, not just current but former elected state officials that makes this difference? But let me proceed beyond that. There has to be a choice made, and there are really two options here. One is you pay the money up front, and here's how the statute works. The attorney general finds that there's not a credible claim here of willfulness, so your defense costs are being paid up front. If at the end of the day it is concluded that you acted willfully or that you acted outside the scope of your employment, the state doesn't have to indemnify you, to be sure, but they can't get the defense costs back. So what have they done? In contravention of public policy, as set out in the Illinois Supreme Court's decision in Wright, they have paid the defense costs of someone that, let's imagine the hypothetical, everyone can look to and say there was just malicious misconduct here. The alternative is the false negative, and Your Honor's right. It exists. It is possible that the attorney general will conclude that you, that an elected state's attorney has acted willfully, acted maliciously, after undertaking her own due diligence. But we see civil cases all the time that are credible and may survive motion to dismiss, but they're not going to survive a later motion for summary judgment. I don't mean this kind of case. I just mean cases in general. So how can you make, with an independent investigation at the beginning, where you're called upon to make this decision, how can you decide the difference between a credible claim, a prima facie case, and a case that's going to go far enough along that really makes it significant? Your Honor, the General Assembly, this is a very tough spot. The General Assembly faced a situation in which, in 1977, they wanted to create some form of indemnification for public employees. Now, they faced a choice. You're right. You don't know the ultimate answer, just as a court may not at a TRO stage know the ultimate answer of what the merits determination will be at the end of the day. But they entrusted a state official who's responsible to the electorate, here the attorney general, with making this threshold determination. The alternative, and again, I have to turn back to the alternative. The alternative is to defy public policy and to have cases out there in which individuals will have been paid, perhaps for many years, with irrecoupable sums from the public fisc, to defend against an action in cases where anyone who looked at it, again, to take an example, because we have to consider the extreme example, anyone would have realized that, at the end of the day, this person was not acting in a lawful manner. Do we have to disregard Tully versus Edgar to agree with your position? Not at all, Your Honor. Tully is on all fours with our position. There's absolutely no contradiction. Tully said that the second paragraph in B2 is a stand-alone provision and different from the earlier one. That's not your position, is it? As you just stated, it's not, Your Honor. But let me be clear. What Tully said was there's language in the end of 2A that has to do with whether or not and this is critical because the Tully court lumped these two situations together, page 481 of the ILAP third version, page 483 of the ILAP third version. The court does this twice. It lumps together cases where there's private lawyers because there's a conflict by the AG and instances where there's a public official who's opted to have a private lawyer, in cases where the Attorney General has found that there's a need to defend. I mean, that issue was not before the court. What they said is given professional norms that govern the operation of the attorney-client relationship, it would be reasonable to say that that language about the Attorney General directing litigation at the bottom of 1A doesn't apply just because the state is paying the attorney's fees. So even if Tully were correctly decided, there's nothing about it. All it did was reconcile the professional judgment that's required on the part of attorneys and their fiduciary duty to their clients. Let me raise another question, one that concerns me here. If I understand correctly where we're going, the fundamental argument from Mr. Eckel is about the second paragraph, that elected state officials are different. Yes. And they are meant to be dealt with differently for lots of policy reasons he talked about. There are tens of thousands of state employees. How many elected state officials are there? Very few by comparison. Well, I mean, I think we can come up with a definitive number, can't we? I mean, just talking right here? The six constitutionals, the state's attorneys, the members of the General Assembly, the judges as was noted are treated separately. But the judges are already covered otherwise in Section 6. Exactly. Which, by the way, shows how the General Assembly, the phrase notwithstanding the foregoing is precisely what plaintiff wishes they had put. That was a later addition, not reflective of the initial 1977 intent. But it certainly suggests the General Assembly knows how to say notwithstanding the foregoing. The premise of my question is this. Elected state officials are prosecutors. We've got 102 of them in the state of Illinois and six executive people, and that's it. So when we're talking about elected state officials, it seems to me that the legislature used to have a board of trustees, but they're now gone. That's what Tully v. Edgar was about. So we're talking about special protection for prosecutors, aren't we? Isn't that what this is about? And why shouldn't that be, for the reasons Mr. Eccles talked about, a separate category where the legislature said, you know, we don't want these people who are exercising the powers of the state, going after bad guys, to worry about getting sued. So and they might also, I remember in 1977, we still had our litigation for sport coming out of the state pens. They might have decided, we don't care what the allegations are. If you are an elected state official, the state's attorney, you're going to be covered and defended. Why wouldn't that be consistent with sound public policy? It also applies to members of the General Assembly. So it's not just the six elected officers and then the 102. On its face, it actually does apply to members of the General Assembly. By name. And that's the only one's name. Yeah, they're the only ones named. And so it's both under-inclusive but over as well, because there are also far more unelected prosecutors in the state than there are elected prosecutors in the state. Indeed, there are. Elected state officials would be the concern. But oftentimes it's the lower level who are sued. If you're concerned about prosecutorial discretion, this would have been the worst way to go about defending. They would have made it over-inclusive by protecting all members of the General Assembly and drastically under-inclusive by omitting all non-elected prosecutors. And the other reason that I would say is even if we disagreed with this policy choice, there's simply nothing here, and I'm aware of no precedent, to suggest that this second paragraph that doesn't begin with any sort of notwithstanding or any other qualifier can be used to surgically remove a mere seven words from the preceding paragraph. There's been no authority cited. I'm aware of no authority that would permit that kind of surgical revision to the first paragraph of 2B. What is that paragraph doing there? That second paragraph in B. Sure. What is it doing there? It doesn't make sense to me when I read the sketch. Could that paragraph be placed somewhere else? I'm certain it could be. But let me try to. Here's my best sense. Under your theory, what does it add that isn't otherwise covered? Oh, it absolutely changes. Let me distinguish between two concepts. One is the scope of the duty to defend. That involves things like were you acting within the scope of your authority, and therefore there's a duty to defend. Were you acting without malice, duty to defend. That's the scope. 2B begins by defining the scope of the authority, the state's duty to defend. As the paragraph proceeds, it places limitations not on the scope of that duty, but who will perform the duty. So, for example, it first hits instances of attorney general conflict of interest. Well, the duty to defend exists, but who does it change is, understandably, under those circumstances. The paragraph, the second paragraph, at the risk of a long-winded answer, and I apologize, the second paragraph goes directly to the second question, not to the duty, not to the scope of the duty. That's all been covered earlier. And as I said, they concede there are limits on the scope, even as to elected officials. And 2B makes clear the attorney general makes that determination. What's left, who does it? And there's a special rule for elected officials that, not in terms of the scope of the state's duty, but who do they get to choose, that is what's affected by that second paragraph. And unlike any other unelected official, an elected official has the right to change the answer of, if I'm entitled to be defended, who defends me. It doesn't stand for law in 2A. That's my whole point, because 2A starts out saying, state employees, you get the AG. But to me it makes sense if it was in 2A, but if you're an elected official, you get to hire your own lawyer. And likewise with 2C. We're not permitted to say, well, the legislature put it in the wrong place. We can't draft our reading of it onto a statute where it includes that paragraph in 2B. Well, Your Honor, 2B, the first paragraph, again, deals both with scope and who defends. And as we've already discussed, there can't be any objection to the fact that the second sentence of 2B applies equally to unelected officials. If it didn't, they'd be in the absurd position of having to have the Attorney General approve their choice of lawyer, even in cases where she has an actual conflict of interest. So we know the second sentence of the first paragraph of 2B applies directly to elected and unelected officials. We know the General Assembly used the word employee throughout 2B. We can't change that to say unelected employee when it's clearly defined just a couple of paragraphs earlier to include all employees. You need to conclude, Mr. Schover. Thank you. Your Honor, in conclusion, what they've asked the court to do is radical surgery, not grafting, as they have suggested, but rather to elide seven words from 2B, first paragraph, without authority to do so. And I would finally conclude by saying, in the event that the court were to disagree on that point, we would simply stand on our brief for the proposition that the word is, is indeed a present tense verb, and in light of the definition of employee in 1B, was intended to limit the individuals who could take advantage of it. And that limitation is perfectly consistent with the policy rationale given, which is that those in office are answerable to the electorate. That policy applies only to people who are in office. One quick thing. This is a 2-6-15 dismissal, not a 2-6-19, isn't it? Both were raised, the court's language, but it was a 2-6-19.1, so it incorporated both. But it was dismissed as a failure to state a cause of action, wasn't that the court's thinking? Did it give any reason for that? The court didn't give a reason, Your Honor. It said that it's not, they haven't made the showing required for mandamus relief. But I will say the suggestion that's made in the brief, that the court may have been under the misimpression that if there's debate over what a statute means, mandamus is inappropriate, that that cannot be the case. We never argued that below. And if you look at pages 89 to 93 of the appendix, you'll see our substantive argument, and nowhere did the state contend that that was the case. Thank you, Your Honor. Thank you, Kenneth. Mr. Apple? Your Honor, I'll just make some brief comments. I fully intended today not to get into the why issue here. Why is the Attorney General doing what she's doing? Counsel raised it, so I'm going to address it. It's a bunch of hogwash that there was some kind of intensive investigation done of this case, and the Attorney General has sat through depositions or knows all about the facts of the case. That's just simply not true. In simple terms, this was a political decision that was made here. Nothing more. Is that reviewable, even if you're right? No. No. But I'm just telling you what was just represented to the court about some extensive review to see misconduct, and they found this Brady violation, because it was mentioned in a case involving Mr. Whitlock. As we all know, Brady violations do not have to be intentional to be actionable. They can be inadvertent. I was accused of a Brady violation back when I was first a prosecutor because I didn't know any better. So finding that there was a Brady violation in connection with this case does not establish that there was willful and wanton misconduct by Mr. McFatridge. And you know what else? The Brady violation has nothing to do with the civil rights case because Brady violations under federal civil rights law occur at the time of trial, and all of those acts of a prosecutor at trial are covered by absolute immunity. So the decision if it was based upon a Brady violation not to defend McFatridge has nothing to do with the civil rights case. So that's nothing but a red herring. What you just heard from counsel is a bunch of dancing around trying to make this case a lot more complicated than it actually is. Tully was very clear. Tully talked about the fact that it was notable that the cooperate, consent, and settlement language used in 2A does not appear in 2B. The omission is significant. No explanation by counsel to the language of that decision. When an elected official is sued because of some alleged wrongdoing while acting as an elected official, the attorney general only has the discretion to refuse payment or defense costs if he or she finds the elected official's choice of counsel unsatisfactory or that the defense charges are unreasonable. We don't have to make this determination. Our reading of the second paragraph of 2B any more complicated than that. The concept that somehow we have interpreted portions of the first paragraph into the second paragraph, that's without support in the record. The only statement we have ever made is that 2A says that it must be within the scope of official duties. We are not suggesting any incorporation of the first paragraph of 2B into the reading of the second paragraph. Let me ask you to address Mr. Scudro's comment with regard to the policy issue. You argued, gee, a poor prosecutor is going to be left bereft of any support, etc. He responds, well, if that's true, what about assistant state's attorneys who might similarly be sued? What about that? If this is designed to protect elected prosecutors and we should view them separately and distinct and essentially view the legislature as providing additional protections, why would the legislature do that and not provide the same sorts of protections for assistant state's attorneys which vastly outnumber the elected state's attorneys? It's a huge problem, Judge. And a problem that's going on right now up in Lake County where they have the state's attorneys sued and the assistants and certain parties are agreeing to cover the state's attorney but not the assistants. It is a huge problem, but the solution is that counties now are getting riders onto their insurance coverage. It says that it covers county employees as well as assistant state's attorney and county elected officials. So the way the problem is getting solved right now is by getting additional insurance coverage. Well, but for purposes of the statutory interpretation, which you'd argue to us, if it was the legislature's intent to protect prosecutors who are elected, do we have to conclude that that's a difference from prosecutors who are just the line troops, so to speak? Because as you've suggested here, maybe there would be elected prosecutors by definition have gone through the political process and maybe that would make them more vulnerable to the attorney general than just some typical line troop phony guy. And they're going to get sued in every case that the assistant is sued. They're going to sue the state's attorney for a lack of control, discipline, training, etc. So I suppose if the legislature really thought about this, they would have covered the assistant state's attorneys as well. Do I think that they really gave thought to the ramifications this could have on the line troops? Probably not. But it is a... I think an argument can also be fashioned that there are other sources of indemnification for the line assistants as well. But I don't think it really drives the determination or the interpretation of the statute, but I will acknowledge it is a problem that exists today. Yes. Judge, it is a huge issue. And it's one that needs to be decided. And I would hope that this court would do what I know you always do, which is a well-reasoned decision, which in this case would be in our favor, and the attorney general would look at it and say, you know what, I think we've had enough of this, let's move forward. Frankly, I don't know why we're here. I don't know why they're doing what they're doing in this case, because it makes no sense to me. If McFatridge walked in and said, you know what, I'm sick of... or I should say, if I told McFatridge, I don't want to represent you free anymore, hoping this thing gets worked out, and you're on your own, and he let a judgment be entered against him, they have to pay. So I don't get this. I don't get why they're taking the position they are, because it makes no sense to the people of Illinois. This is a case where the defense are asking for $40 million. So this isn't chump change. Under 2D, and this is where counsel, in all due respect, has misrepresented 350-2D. What that statute says, that there is a right of indemnification unless the court finds that the conduct which gave rise to the claim was intentional, willful, and wanton, and that it was not intended to serve or benefit the interest of the state. Here, it's really a little different. It is, Judge. But all I can tell you is that under 2D, they're talking about a two-prong test. You know, was there, in fact, intentional misconduct, and was it not intended to serve or benefit the interest of the state? If both those things exist, then there's no indemnification. If one exists and one doesn't, then there is indemnification. So the jury could find both intentional misconduct and if the conduct wasn't intended to benefit the interest of the state. It's theoretically possible, but under the circumstances of this case, virtually impossible for a jury to conclude that when you're prosecuting murderers or people accused of murder in a courtroom, that you are not intending to serve or benefit the state of Illinois. So that would be a jury question that would be answered. Right. It would be a jury question, but the jury could conclude. And I don't know much about the facts or the allegations, but let's assume that what they've alleged is true about the state's attorney's conduct. Couldn't you make the argument that the conduct didn't benefit the interest of the state because the state's obligation is to seek justice and not just a conviction, no matter what? You could make that argument, but there's a pretty persuasive argument that when you're prosecuting a case, that you are serving the interest of the state of Illinois. And I'm influenced in answering your questions because I know all of the facts and circumstances of this case. And that argument would not be a viable one in this case. Counsel, I want to just mention briefly before we choose to thank everyone for coming down here to the University of Illinois and especially on all counts of the offense, for arguments and evidence and something put down the way that this is how we're doing. Well, thank you very much, Judge. Nice. Thank you all. Thank you.